**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| NATIVE PIXEL INC., | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 2:26-cv-00771 |
| | § | |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| WAVEMAKER, INC., | § | |
| | § | |
| Defendant. | § | |

**COMPLAINT FOR PATENT INFRINGEMENT**

This is an action for patent infringement arising under the Patent Laws of the United States of America, 35 U.S.C. § 1 *et seq.*, in which Plaintiff Native Pixel Inc. ("Plaintiff") makes the following allegations against Defendant WaveMaker, Inc. ("Defendant" or "WaveMaker"):

**PARTIES**

1. Plaintiff Native Pixel Inc. ("Native Pixel" or "Plaintiff") is a Florida corporation with its principal place of business at 8018 Laurel Ridge Court, Delray Beach, FL 33446.

2. On information and belief, Defendant WaveMaker, Inc. ("WaveMaker" or "Defendant") is a corporation duly organized and existing under the laws of the State of Delaware. It has a place of business and is headquartered at 4965 Preston Park Blvd, Suite 825, Plano, Texas 75093. WaveMaker may be served with process through its registered agent, VCORP SERVICES, LLC, located at 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

3. On information and belief, WaveMaker directly develops, designs, manufactures, uses, distributes, markets, offers to sell and/or sells infringing products and services in the United States, including in the Eastern District of Texas, and otherwise directs infringing activities to this

District in connection with its products and services as set forth in this Complaint. This includes but is not limited to at least the following: the WaveMaker Low-Code Platform (including WaveMaker Studio, Web Studio, and React Native Studio), the WaveMaker AI Platform available at wavemaker.ai, the WaveMaker Rapid Application Platform, the Two-Pass Coding System (including WaveMaker Markup Language ("WML")), SDLC Agents, AIRA, Hybrid Studio, the Productivity Workbench, WaveMaker Enterprise and WaveMaker Enterprise Edition, WaveMaker AppChef, WaveMaker Prefabs and the Prefab Library, the WaveMaker Widgets Library, the WaveMaker Custom Widget SDK, the WaveMaker UI Kit, WaveMaker Templates and Themes, the WaveMaker Marketplace, the WaveMaker API Designer, WaveMaker Mobile Apps and the Mobile App Builder, and related products and services.

**INTRODUCTION**

4. This Complaint arises from Defendant's unlawful infringement of United States Patent No. 10,331,423 B1 (the "'423 Patent"), entitled "Utilizing Cross Platform Streamable User Interfaces to Reduce Software Deployment Frequency Caused by User Interface Improvements," which was duly and legally issued by the United States Patent and Trademark Office ("USPTO") on June 25, 2019. The '423 Patent is referred to herein as the "Asserted Patent" or the "Patent-in-Suit."

5. This action is related to *Native Pixel Inc. v. WaveMaker, Inc.*, Civil Action No. 2:26-cv-00205-RSP (E.D. Tex., filed March 16, 2026) (the "-205 Action"), in which Native Pixel asserts United States Patent Nos. 11,816,459 and 12,118,335 against WaveMaker. Native Pixel filed its First Amended Complaint in the -205 Action on August 6, 2026 (Dkt. 44). The '423 Patent is a member of the same patent family as the patents asserted in the -205 Action: all three patents trace priority to U.S. Patent Application Serial No. 15/352,834, filed on November 16, 2016. The

'423 Patent is not asserted in the -205 Action, and this Complaint asserts only the '423 Patent. The claims of the '423 Patent are directed to a different, complementary invention: a specific client-server architecture for streaming user interfaces to already-deployed native executables at runtime, as described below.

6. The '423 Patent covers foundational technology conceived, developed, and patented years before many current market participants entered the low-code/no-code and design-to-code space. The invention arose from the pioneering work of inventor Frank Parsolano at ZigiSoft, LLC, who recognized as early as 2016 that the traditional software development paradigm—in which every user interface improvement required recompiling an application and redeploying it through digital application marketplaces—was fundamentally inefficient, unsustainable, and incapable of keeping pace with the explosive proliferation of platforms, device types, and screen sizes.

7. Mr. Parsolano filed the foundational patent application (U.S. Application Serial No. 15/352,834) on November 16, 2016. The '423 Patent issued from U.S. Application Serial No. 15/678,218, filed August 16, 2017 as a continuation of the foundational application, and claims the benefit of the November 16, 2016 priority date.

8. PixelFree Studio, Inc., a Nevada corporation ("PixelFree Studio" or "PixelFree"), is a pioneering software development company headquartered in Delray Beach, Florida, with major development operations in Saarbrücken, Germany. PixelFree Studio has developed a revolutionary, patented design-to-code platform that enables designers and developers to transform graphical user interface designs into production-ready, human-readable native code across multiple programming languages and platforms with a single click. PixelFree Studio's

technology reduces front-end development time by up to 80%, converting projects that once took months into tasks completed in minutes.

9. PixelFree Studio was co-founded by Philipp Geppert (CEO), Solomon Hartman (President), Arnie Foxx (Founder), and Felix Förster (CFO). The company's genesis traces to foundational work in graphical user interface programming systems, with its earliest patent applications filed as early as 2016. The late Solomon Hartman (d. May 2025) was instrumental in shaping the company's intellectual property strategy and commercialization efforts. Native UI, Inc., a Florida corporation ("Native UI"), spun off from PixelFree Studio on or about November 28, 2022, to separately pursue development and commercialization of the technology.

10. PixelFree Studio has received significant market validation for its innovative technology. The company has twice been awarded the prestigious European Union Seal of Excellence—a quality label awarded by the European Commission to proposals submitted under Horizon Europe calls that meet rigorous quality thresholds—recognizing PixelFree Studio's industry-leading innovations in design-to-code technology, accessibility solutions, and sustainability practices. PixelFree Studio showcased its software at Web Summit 2023 in Lisbon, Portugal, and has been featured at SaaS Open in Austin, Texas, among other industry events. The company secured separate loans of One Million Euros (€1,000,000) and Five Hundred Thousand Euros (€500,000) from EFRE (a European governmental lending source) to accelerate development and commercialization of its platform, further validating market confidence in its technology.

11. Native Pixel, Inc. is the intellectual property holding and enforcement arm of the PixelFree Studio and Native UI family of companies. Native Pixel was established to hold, manage, protect, and enforce the valuable patent portfolio developed by and originally assigned to

ZigiSoft, LLC, PixelFree Studio, Native UI, and their affiliated entities. Native Pixel serves as the centralized vehicle for intellectual property monetization, licensing, and enforcement activities related to the foundational patents developed through years of substantial research, development, and investment.

12. Native Pixel, Inc. is the current owner by assignment of all right, title, and interest in and to the '423 Patent, including the right to bring this suit for injunctive relief and damages, and including the right to sue and recover all past, present, and future damages for infringement of the '423 Patent. The assignments in the '423 Patent's chain of title are recorded with the USPTO, including the assignment from ZigiSoft, LLC to PixelFree Studio recorded December 29, 2019 at Reel 051382, Frame 0797; the assignment from PixelFree Studio, Inc. and Native UI, Inc. to Native Pixel, Inc. executed December 22, 2025 and recorded January 4, 2026 at Reel 073357, Frame 0004; and the amended and restated patent assignment and consolidation agreement executed effective February 26, 2026 and recorded July 13, 2026 at Reel 075256, Frame 0029, in which, among others, inventor Frank Parsolano and ZigiSoft, LLC each conveyed to Native Pixel, Inc. all of their right, title, and interest in the '423 Patent, including all rights to sue for past, present, and future infringement and to collect all damages. Defendant does not have a license to the '423 Patent, either expressly or implicitly, nor does Defendant enjoy or benefit from any rights in or to the '423 Patent whatsoever.

**THE '423 PATENT**

13. On June 25, 2019, the '423 Patent, entitled "Utilizing Cross Platform Streamable User Interfaces to Reduce Software Deployment Frequency Caused by User Interface Improvements," was duly and legally issued by the USPTO from U.S. Application Serial No. 15/678,218, filed August 16, 2017, naming Frank Parsolano as inventor, and identifying ZigiSoft,

LLC as applicant. The '423 Patent is a continuation of U.S. Application Serial No. 15/352,834, filed November 16, 2016. The '423 Patent received a patent term adjustment of 105 days under 35 U.S.C. § 154(b). A true and correct copy of the '423 Patent is attached hereto as Exhibit A.

14. The '423 Patent expired on June 25, 2023, due to nonpayment of the 3.5-year maintenance fee. The delay in payment of the maintenance fee was unintentional. Among other things, PixelFree Studio founder Arnie Foxx—who had responsibility for the patent portfolio—was diagnosed with Stage 4 lung cancer in the fall of 2021 and passed away in June 2023, during the very window in which the maintenance fee came due, and the patent's status went unmonitored through the ensuing management transition. The unpaid status of the maintenance fee was discovered on or about August 17, 2025, and the patentee promptly petitioned the USPTO under 35 U.S.C. § 41(c)(1) and 37 C.F.R. § 1.378(b) to accept late payment of the maintenance fee, beginning on August 26, 2025.

15. By Decision on Petition of the USPTO's Office of Petitions, notice of which was electronically transmitted on June 4, 2026, the USPTO granted the renewed petition filed May 7, 2026, confirmed receipt of the 3.5-year maintenance fee and the petition fee under 37 C.F.R. § 1.17(m), accepted the accompanying statement establishing that the entire period of delay was unintentional, and expressly held: "The above-identified patent is reinstated, accordingly." A true and correct copy of the Decision on Petition is attached hereto as Exhibit C. Pursuant to 35 U.S.C. § 41(c)(1), acceptance of the late maintenance-fee payment means the '423 Patent "shall be considered as not having expired" as of the acceptance. The '423 Patent is therefore in full force and effect, is presumed valid and enforceable under 35 U.S.C. § 282, and will remain in force until its expiration date in 2037.

16. The '423 Patent claims patent-eligible subject matter. Native Pixel is the exclusive owner by assignment of all rights, title, and interest in the '423 Patent, including the right to collect damages for past, present, and future infringement, as well as injunctive relief.

17. Plaintiff has complied with the requirements of 35 U.S.C. § 287 with respect to the '423 Patent.

18. A claim chart showing infringement of exemplary claim 12 of the '423 Patent by the Accused Products, charted against representative Accused Product WaveMaker Studio, is appended to this Complaint as Exhibit B.

## DAMAGES PERIOD

19. Native Pixel seeks damages in this action for Defendant's infringement of the '423 Patent occurring on and after June 4, 2026, the date on which notice of the USPTO's decision reinstating the '423 Patent was electronically transmitted. Native Pixel does not seek damages in this action for the period from June 25, 2023 through June 3, 2026, during which the '423 Patent stood expired for nonpayment of the 3.5-year maintenance fee, and this action accordingly presents no occasion for the application of 35 U.S.C. § 41(c)(2) to that period. Native Pixel reserves the right to seek damages for any infringement occurring before June 25, 2023, to the extent recoverable within the limitations period of 35 U.S.C. § 286 and consistent with 35 U.S.C. § 287.

## THE TECHNICAL PROBLEMS THE '423 PATENT SOLVED

20. The '423 Patent identifies, and its claims solve, specific technical problems that were endemic to cross-platform software development at the time of the invention in 2016—problems arising specifically in the realm of computer technology and having no pre-computer analog.

21. First, the '423 Patent identifies the problem of per-platform, framework-dependent user interface development. As the specification explains: "Currently, traditional mobile platform application development relies heavily on proprietary frameworks and brute force development of individual applications for each supported platform. That is, the traditional approach requires development of one functionality for an application must be implemented and tested on each platform separately or rely heavily on runtime frameworks which introduces significant application overhead and results in decreased application performance." '423 Patent at 1:37-45. These framework-based approaches "consume[] a significant amount of development time (e.g., framework learning curve) and cost (e.g., framework license cost)." *Id.* at 1:46-48.

22. Second, the '423 Patent identifies the technical problem of forced application redeployment for every user interface change: "Each time a user interface design improvement is made, the application must be redeployed. This can frustrate users who are forced to download and/or install the application multiple times to receive the improvements during the development cycle. This extra overhead can impede user usage and damage brand positivity, resulting in lost users and lost income." '423 Patent at 1:64-2:3.

23. The specification traces these problems to their technical root cause: the static nature of compiled user interfaces. "In a traditional approach, once an executable is compiled from a source code (which can include drawing instructions for user interface), the layout of the user interface programmed within the source code is static during runtime of the executable. That is, no changes can be made to the layout of the user interface without requiring the recompiling of the source code and associated drawing instructions of the user interface." '423 Patent at 5:58-65. In 2016, this static-compiled-UI model, together with wholesale redeployment of applications

through digital marketplaces (such as app stores) for every user interface change, was the well-understood, routine, and conventional practice in the industry.

## THE PATENTED TECHNICAL SOLUTION

24. The '423 Patent claims a specific, unconventional client-server software architecture—not a result, a business practice, or an abstract idea—that solves these technical problems by fundamentally restructuring where user interface information lives, how it is delivered, and when it is rendered.

25. In the claimed architecture, at least one characteristic of a user interface—specifically including both a layout characteristic and a control element characteristic—is abstracted out of the application's source code into a "view-controller object" that conforms to an environment-independent format. The executable that is compiled from the source code and deployed to users deliberately lacks the user interface characteristics; in their place, the executable is built with an embedded "placeholder functionality" that lacks those characteristics but knows how to obtain and render them at runtime. '423 Patent, claim 1; *id.* at 9:17-24 ("UI placeholder 154 can be a framing mechanism for integrating layout instructions, arbitrary control elements . . . within container application 152 . . . . [P]laceholder 154 can include one or more overridable functions, data structures, state information, and the like which can permit control elements 134 to be linked (e.g., coupled) to code 156 during runtime 140.").

26. The view-controller object is converted—on the server side—into a language-specific user interface object that conforms to the programming language of the target native runtime environment, and the UI-less executable is deployed through a digital marketplace to authorized users. Only during runtime does the executable receive the user interface object and render the user interface, and the executable can even ignore user interface programming

instructions embedded within itself in favor of rendering a different user interface from the streamed UI object, which is cached within a data store of a server communicatively linked to a software development tool. '423 Patent, claim 1; *id.* at 9:33-42 (the application may include "a default user interface (e.g., stock interface) which can be selectively ignored during runtime and streamable UI instructions can be used to render the user interface").

27. As the specification explains, this architecture directly removes the technical root cause of the redeployment problem: "The disclosure overcomes these limitations by providing a user interface object (e.g., streamable UI 130) for drawing the user interface. The UI object can be addressed using traditional programming techniques (e.g., via object identifier/object reference). Since the object can be a data set (e.g., layout data) and/or classes of drawing instructions, the object can be refreshed during runtime without requiring recompilation." '423 Patent at 5:65-6:5.

28. The claimed architecture employs a deliberately decoupled variant of the model-view-controller paradigm: "the disclosure leverages a decoupled approach to MVC permitting the view and controller to be substantially decoupled from the model of the architecture. In this manner, container application 152 can remain largely unmodified in the presence of major user interface improvements." '423 Patent at 6:44-49. All cross-platform translation is performed server-side: "all cross-platform translation is performed for the runtime environment 140 by platform 112 and parsing/presentation of streamable UI can be performed using only functionality of the runtime environment 140." *Id.* at 8:30-33.

29. Claim 10 of the '423 Patent recites a system implementing this architecture with additional specific components: a "streaming engine" configured to create a "wrapper library" for the user interface, permitting the source code to address the user interface through the wrapper library; an engine configured to determine a "delta" between UI objects; a data store configured to

remotely persist the wrapper library, source code, and user interface; a "caching component"; and a "UI streamer" configured to dynamically convey the delta between UI objects to the executable during runtime. '423 Patent, claim 10; *id.* at 12:19-51. The delta mechanism enables piecemeal, differential user interface updates: "layout 416 and/or elements 418 can be transmitted piecemeal to enable selective UI updates," *id.* at 13:5-6, with "UI mapping 432 . . . enabling granular control over UI synchronization during runtime," *id.* at 13:20-21, and a handler "utilized to maintain a local cache of interface 414 which can be compared against a remote cache during application startup," *id.* at 13:47-49.

30. Claim 12 of the '423 Patent recites a computer program product implementing the design-time-through-runtime pipeline: graphically designing a user interface "archetype" within an integrated development environment; generating an environment-independent view-controller object from the archetype; compiling the source code into an executable lacking sufficient drawing instructions to draw the user interface at runtime, the executable containing references to an object identifier and instruction identifiers; storing the UI object for retrieval during runtime; receiving and processing the stored UI object during runtime within the target native runtime environment; drawing the user interface using the drawing instructions of the UI object; deploying the UI-less executable within a digital marketplace; and, during runtime, ignoring a user interface programming instruction embedded within the executable and rendering a different user interface from the UI object. '423 Patent, claim 12.

## <u>**SPECIFIC TECHNOLOGICAL IMPROVEMENTS OF THE CLAIMED INVENTIONS**</u>

31. The claimed architecture yields specific, concrete improvements to the functioning of computer systems themselves, each of which is described in the specification and is attributable to the claim limitations:

32. Runtime UI updating without recompilation. Because the user interface is delivered as a streamable object rather than compiled into the executable, "the object can be refreshed during runtime without requiring recompilation." '423 Patent at 5:65-6:5. This was not possible under the conventional static-compiled-UI model described at 5:56-65.

33. Elimination of application redeployment and marketplace resubmission for UI changes. "[A]n application 152 developer can make innumerable changes to the UI 130 and dynamically deliver the UI without requiring application 152 to be deployed. Consequently, users are not forced to update the application 152 to have access to an updated version of UI 130." '423 Patent at 8:63-67. The specification expressly identifies "the reduction in submission and/or approval process frequency for application 152 resulting from UI improvements" as an advantage over traditional applications. *Id.* at 9:10-13.

34. Bandwidth- and resource-conserving differential updates. The claimed delta mechanism of claim 10 permits user interface changes to be "transmitted piecemeal to enable selective UI updates," '423 Patent at 13:5-6, so that only the changed portions of a user interface—rather than an entire application binary—traverse the network, with local and remote caches compared at startup, *id.* at 13:47-49.

35. Reduced application overhead and improved performance. The claimed architecture avoids reliance on "runtime frameworks which introduce[] significant application overhead and result[] in decreased application performance," '423 Patent at 1:43-45, and server-side serialization ensures "performance of application 254 is unaffected," *id.* at 10:59-60.

36. Extension of dynamic UI delivery to resource-constrained devices. "[S]treamable UI 130 can be conveyed to limited resource devices to enable dynamic content delivery without modifying the executable," which can "extend the content delivery ability of Internet of Things

(IoT) devices and/or smart devices (e.g., smart TVs) by enabling post deployment UI changes to be affected during runtime." '423 Patent at 9:47-53.

37. These improvements change how the computer system itself operates—what the deployed executable contains, what travels over the network, where cross-platform translation occurs, and when and how user interfaces are rendered. They are not improvements to a business practice, to the presentation of content, or to any process that could be performed mentally or by pen and paper.

## THE '423 PATENT CLAIMS PATENT-ELIGIBLE SUBJECT MATTER AND ITS CLAIMED COMBINATIONS WERE NOT WELL-UNDERSTOOD, ROUTINE, OR CONVENTIONAL

38. The claims of the '423 Patent are directed to a specific improvement in the way computers operate—a specific architecture for constructing, deploying, and updating cross-platform native applications—and not to an abstract idea. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016) ("Software can make non-abstract improvements to computer technology just as hardware improvements can."); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1362-63 (Fed. Cir. 2018) (claims directed to specific user interface technology are eligible); *Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018) (a "specific technique that departs from earlier approaches to solve a specific computer problem" is eligible); *Contour IP Holding LLC v. GoPro, Inc.*, 113 F.4th 1373, 1378-80 (Fed. Cir. 2024) (claims reciting "specific, technological means" that "provide a technological improvement" are eligible).

39. The problem the '423 Patent solves—that compiled native executables distributed through digital application marketplaces contain static user interfaces that cannot be changed without recompilation and redeployment—is a problem that exists only in computer technology. The claimed solution is necessarily rooted in computer technology to overcome that problem: it

restructures the executable itself (removing the UI and embedding placeholder functionality), the server (view-controller abstraction, conversion, caching, streaming, delta computation), and the marketplace deployment pipeline. *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014). No human ever performed, and no human could perform, these operations mentally or with pen and paper: a human cannot embed placeholder functionality in a compiled executable, stream serialized view-controller objects to a native runtime, compute deltas between cached UI objects, or render a user interface at runtime from a streamed object.

40. The claims do not merely recite a desirable result; they recite the specific technical mechanism for achieving it: the abstraction of layout and control-element characteristics into an environment-independent view-controller object; the embedding of placeholder functionality that lacks those characteristics within a target-native executable; server-side conversion of the view-controller object into a language-specific UI object; marketplace deployment of the executable lacking the user interface; runtime receipt and rendering of the UI object by the placeholder functionality; runtime override ("ignoring") of embedded UI instructions; server-side caching linked to a development tool; and, in claim 10, wrapper-library creation, delta determination, remote persistence, caching, and dynamic delta streaming during runtime. This "how" distinguishes the claims from result-oriented claims held ineligible. *See McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314-16 (Fed. Cir. 2016).

41. Nor are the claims directed to the "mere automation" of a previously manual process. Before the invention, no manual process existed—and none could exist—for streaming user interfaces to deployed native executables at runtime. The conventional computerized process (static compiled UIs with full recompilation and marketplace redeployment) operated in a fundamentally different way than the claimed architecture. Automation cases are therefore

inapposite, and the claims are eligible for the same reasons the claims in *McRO*, 837 F.3d at 1314-15, and *PowerBlock Holdings, Inc. v. iFit, Inc.*, 146 F.4th 1366, 1372 (Fed. Cir. 2025), were eligible: the claimed process is not the same process previously performed, and it is claimed with "specific implementation" detail.

42. The claims are likewise nothing like claims directed to collecting, analyzing, and displaying information, *see Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1353-54 (Fed. Cir. 2016), or to encoding and decoding data, *see RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1326 (Fed. Cir. 2017). The claimed system does not gather or present information for human consumption; it manufactures, deploys, and dynamically reconfigures functioning software artifacts, changing what the computing system itself produces and how deployed applications behave at runtime. In that respect the claims are analogous to claims directed to a new kind of file or software artifact enabling new functionality, which the Federal Circuit has sustained. *See Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1304-06 (Fed. Cir. 2018).

43. Nor is claim 12 a bare computer-readable-medium recitation of an otherwise abstract process of the kind held ineligible in *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1375 (Fed. Cir. 2011), or a claim to information in the abstract of the kind held ineligible in *Digitech Image Technologies, LLC v. Electronics for Imaging, Inc.*, 758 F.3d 1344, 1349-51 (Fed. Cir. 2014). The program code claim 12 recites cannot be performed in the human mind: it graphically designs archetypes within an integrated development environment, generates environment-independent view-controller objects, compiles executables, stores and processes UI objects during runtime, and performs runtime receipt, drawing, and override operations within target native runtime environments. And claim 12 recites the structural characteristics of the artifact the code produces: an executable "lacking sufficient drawing instructions to draw the user

interface within the target native runtime environment during runtime" that "comprises of a reference to the object identifier and at least one reference to an instruction identifier," deployed UI-less within a digital marketplace. What the claimed program code produces, and what the produced executable structurally lacks and contains, are concrete technical limitations on the claimed computer program product, not drafting formalities.

44. The claim elements, individually and as an ordered combination, were not well-understood, routine, or conventional as of the November 16, 2016 priority date, and supply inventive concepts under *Alice* step two:

45. In 2016, the well-understood, routine, and conventional approach to distributing native applications was to compile the complete user interface—layouts, control elements, and drawing instructions—into the application binary, and to deliver every user interface improvement by recompiling the application and redeploying it through a digital marketplace, subject to marketplace review and user reinstallation. That conventional approach is described in the '423 Patent itself at 1:36-2:3 and 5:56-65.

46. It was not well-understood, routine, or conventional in 2016 to deploy, through a digital application marketplace, a target-native executable that deliberately lacked its user interface; to embed in such an executable a placeholder functionality that lacks the abstracted layout and control-element characteristics; to stream a serialized, language-specific user interface object to that executable at runtime; to have the executable ignore user interface programming instructions embedded within itself in favor of a streamed user interface; or to dynamically convey deltas between cached UI objects to a running native executable. On information and belief, no commercially available development platform, application marketplace, or deployed application employed the claimed combination as of November 16, 2016.

47. The USPTO's own examination record confirms the absence of these features from the prior art. In allowing the claims, the Examiner identified the four closest prior art references—Loveland (U.S. Patent No. 6,782,413), Weitzman (U.S. Pub. No. 2003/0197726), Inanoria (U.S. Pub. No. 2004/0046789), and Jennings (U.S. Pub. No. 2004/0061713)—and stated in the Examiner's Statement of Reasons for Allowance that while this art disclosed abstracting UI characteristics, converting view-controller objects, and rendering user interfaces using UI objects, "the prior art, Loveland, Inanoria, Jennings and Weitzman failed to disclose" the claimed combination culminating in deployment of the executable lacking the user interface within a digital marketplace, runtime receipt and rendering of the user interface object, runtime ignoring of embedded user interface programming instructions, and caching of the UI object "within a data store of a server communicatively linked to a software development tool," as recited by independent claim 1.

48. Each asserted claim recites significantly more than any alleged abstract idea. Claim 1 supplies at least the inventive combination of UI-less marketplace deployment, embedded placeholder functionality, runtime streaming and rendering, runtime override of embedded UI instructions, and development-tool-linked server-side caching. Claim 10 supplies at least the inventive combination of a streaming engine creating a wrapper library through which source code addresses its user interface, delta determination between UI objects, remote persistence of the wrapper library, source code, and user interface, a caching component generating target-native UI objects, and a UI streamer dynamically conveying deltas during runtime. Claim 12 supplies at least the inventive combination of archetype-based design in an IDE, generation of an environment-independent view-controller object, compilation of an executable lacking sufficient drawing instructions but containing object-identifier and instruction-identifier references, runtime retrieval,

processing, and drawing from the stored UI object, UI-less marketplace deployment, and runtime override of embedded UI instructions. Even where an individual component (e.g., a cache, a data store, or a marketplace) was known, the specific arrangement and ordered combination claimed was non-conventional and non-generic. *See BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016); *Cooperative Entm't, Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 130-33 (Fed. Cir. 2022).

49. Whether the claim elements and their ordered combinations were well-understood, routine, and conventional is a question of fact that must be proven by clear and convincing evidence, and the specific factual allegations of this Complaint must be accepted as true at the pleading stage. *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018); *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125-28 (Fed. Cir. 2018); *Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1317-18 (Fed. Cir. 2019).

50. The claims of the '423 Patent do not preempt any abstract idea or any field. Numerous alternative approaches to cross-platform user interface development and updating remain and remained open to the public, including without limitation: compiling user interfaces into application binaries and redeploying applications through marketplaces; webview- and browser-based rendering of server-hosted HTML; hybrid-framework approaches employing middleware runtime frameworks; server-side rendering and pixel or video streaming of interfaces; and interpreted or scripted UI layers. The claims cover only the specific architecture recited in the claim limitations.

51. Each claim of the '423 Patent recites a materially distinct combination of limitations, and no single claim is representative of the others for purposes of any patent-eligibility or validity analysis. Claim 1 is a method claim requiring, *inter alia*, marketplace deployment and

runtime override of embedded UI instructions; claim 10 is a system claim requiring, *inter alia*, a streaming engine, wrapper library, delta determination, and a UI streamer that dynamically conveys deltas during runtime; claim 12 is a computer program product claim requiring, *inter alia*, IDE-based archetype design and identifier-referenced runtime retrieval and drawing. The dependent claims add further distinct, eligibility-relevant limitations, including reflection-based method invocation at runtime (claim 5), cache-to-cache delta computation and runtime delta receipt and adjustment (claims 6-8), conversion performed by a parameterized Web-based service (claim 9), and serialized JAVA/JSON object or compiled class file formats (claims 4, 11). The claim chart attached as Exhibit B illustrates Defendant's infringement; it is not, and shall not be construed as, an admission or allegation that any claim is representative of any other claim for purposes of validity or eligibility.

52. The meaning and scope of multiple '423 Patent claim terms are material to any eligibility analysis and require construction before any determination under 35 U.S.C. § 101 can properly be made, including at least: "placeholder functionality"; "view-controller object"; "environment independent format"; "abstracting"; "lacking sufficient programming instructions to render the user interface"; "delta between the UI object and a different UI object"; "wrapper library"; "streaming engine"; "caching component"; "UI streamer"; "user interface (UI) archetype"; "ignoring a user interface programming instruction embedded within the executable"; "deploying the executable lacking the user interface within a digital marketplace"; "target native runtime environment specific executable"; and "during runtime." Native Pixel contends, for example, that "placeholder functionality" means program code embedded in the compiled native executable that acts as a framing/substitution mechanism which, although it initially lacks the abstracted layout and control-element characteristics, is invoked at runtime to obtain a streamable

UI object and render, or dynamically replace or update, the user interface from that object, *see* '423 Patent at 9:17-42; that "view-controller object" means an environment-independent data object that encapsulates at least the layout and control-element characteristics of a user interface and is distinct from a classic model-view-controller "controller," *see id.* at 6:44-49; that "delta" means the set of changes (added, removed, or modified layout data, control elements, and/or UI metadata) between UI objects used to selectively update the rendered user interface rather than replacing it wholesale, *see id.* at 13:5-27; and that "during runtime" means while the compiled executable is executing, not at compile, build, or deployment time. Under Native Pixel's constructions, the claims recite a specific technological architecture, and any contrary, more abstract reading urged by Defendant presents a claim-construction dispute that must be resolved in Native Pixel's favor at the pleading stage. *See MyMail, Ltd. v. ooVoo, LLC*, 934 F.3d 1373, 1379-80 (Fed. Cir. 2019); *Aatrix*, 882 F.3d at 1125.

53. On information and belief, WaveMaker's own product history confirms that the claimed architecture was not conventional. WaveMaker's earlier-generation tools—including the "Visual Ajax Studio" reviewed in 2008 and the hybrid mobile tooling WaveMaker announced in 2015—did not deploy UI-less native executables, did not stream environment-independent UI objects to deployed executables at runtime, and did not employ delta-based runtime UI updating. Only years after the '423 Patent's priority date did WaveMaker adopt a metadata-driven, runtime-bound architecture—including its WaveMaker Markup Language meta-model, its runtime-bound generated components, and its dynamic runtime UI capabilities—that Native Pixel accuses of infringement herein.

## WAVEMAKER AND THE ACCUSED INSTRUMENTALITIES

54. WaveMaker, Inc. manufactures, uses, tests, sells, offers to sell, and deploys products and services that practice the inventions claimed in the '423 Patent. On information and belief, WaveMaker is a privately held enterprise software company headquartered in Plano, Texas, that develops and commercially markets an AI-powered application development platform used by over 200 large enterprise customers across more than 15 countries in regulated industries including fintech, banking, telecommunications, insurance, and healthcare. WaveMaker is a subsidiary of Pramati Technologies, a Hyderabad, India-based software product company founded in 1998 by brothers Jay Pullur and Vijay Pullur. Vijay Pullur serves as WaveMaker's Chief Executive Officer.

55. WaveMaker's platform is a low-code application development platform, offered through wavemaker.com and wavemaker.ai, that provides a visual, drag-and-drop design studio with pre-built widgets, themes, layouts, and prefabs, and that generates and deploys applications using Angular and React for web and React Native for mobile, with Java-based Spring/Hibernate backends.

56. On information and belief, WaveMaker's platform abstracts user interface characteristics into an environment-independent intermediate representation. WaveMaker's own documentation states that "Figma designs are translated to an intermediate WaveMaker meta markup language (WML), which identifies UI Components, properties and design tokens using AI/LLM." WaveMaker markets WML as a "[s]tructured, HTML-like markup language that serves as the universal meta model for Pages, Components, UI elements, events, and design tokens," states that its "[m]eta model allows platform to upgrade stack silently and handle future migrations to other JS frameworks," and states that its "[t]rained agents generate stack-agnostic app markup

for UI components, layouts, design tokens, API bindings, backend services etc. from UX design, prompts and API." (*See* https://docs.wavemaker.ai/docs/studio/overview/ (last visited August 23, 2026); https://wavemaker.ai/two-pass/ (last visited August 23, 2026); https://wavemaker.ai/platform/ (last visited August 23, 2026)).

57. On information and belief, WaveMaker's generated applications are not self-contained: "The generated React components are not plain React components; they are bound to the WaveMaker runtime," and "[t]he runtime layer manages: Page lifecycle (initialization, ready state, teardown); Two-way data binding between UI components and variables; Service invocation and response mapping; Navigation and event wiring," such that "React . . . serve[s] as the rendering framework while WaveMaker continues to control page composition, data flow, and interaction patterns defined in Studio." WaveMaker's documentation further describes user interface variables whose configuration "is automatically stored in the backend as a JSON file for the page," which are retrieved and processed at application startup and page load, including through "Auto-invoke" behavior that will "[a]utomatically execute during page load or application startup." (*See* https://docs.wavemaker.ai/docs/user-interfaces/web/develop/create-web-app-project/react-project-structure (last visited August 23, 2026); https://docs.wavemaker.ai/docs/user-interfaces/web/develop/integrating-with-apis/ (last visited August 23, 2026)).

58. On information and belief, WaveMaker builds and deploys target-native executables and application packages, including installable APK (Android) and IPA (iOS) packages built from WaveMaker-generated React Native projects through the WaveMaker CLI or AppChef so that the applications "can be listed on the app stores," and WAR/Docker server deployments in which user interface artifacts can be packaged and delivered separately from the application executable (including a separate "ui-artifacts.zip"). WaveMaker also operates a digital

marketplace—"Marketplace[:] A library for developers in the WaveMaker community, where they can access ready-to-use artifacts and also contribute back to the ecosystem"—together with team, role, and permission management controlling authorized access. (*See* https://docs.wavemaker.com/learn/react-native/react-native-overview/ (last visited August 23, 2026); https://docs.wavemaker.com/learn/react-native/mobile-build-manual (last visited August 23, 2026); https://docs.wavemaker.ai/docs/user-interfaces/web/develop/create-web-app-project/project-structure (last visited August 23, 2026); https://docs.wavemaker.ai/ (last visited August 23, 2026)).

59. On or about February 19, 2026, WaveMaker publicly announced an agentic application generation system featuring a "Two-Pass Coding System": in the first pass, AI ingests Figma design files and/or natural-language prompts and generates a tech-stack-agnostic application markup (WML) that abstracts user interface and application architecture characteristics into an environment-independent format; in the second pass, a deterministic code generation engine converts the validated markup into production Angular, React JS, or React Native code. On information and belief, this architecture, together with WaveMaker's runtime-bound component model and metadata-driven UI delivery, practices the inventions claimed in the '423 Patent. (*See* https://www.globenewswire.com/news-release/2026/02/19/3241064/0/en/WaveMaker-Fuses-Design-and-Development-with-Architecture-first-Agentic-Application-Generation-System-for-Enterprise-Dev-Teams.html (last visited August 23, 2026); https://wavemaker.ai/media/launchpr/ (last visited August 23, 2026); https://siliconangle.com/2026/02/19/wavemaker-bets-markup-first-ai-tame-enterprise-app-generation-costs/ (last visited August 23, 2026)). WaveMaker's own Two-Pass page confirms that "[a] custom, deterministic transpiler converts generated WML into production Angular, React JS

or React Native code" with "no AI involved at this stage." (*See* https://wavemaker.ai/two-pass/ (last visited August 23, 2026)).

60. On or about April 21, 2026, after WaveMaker had notice of the -205 Action, WaveMaker and Accenture publicly announced their strategic intent to combine Accenture's software-engineering capabilities with WaveMaker's two-pass code-generation architecture. The announcement describes WaveMaker's platform as supporting generation of Angular, React, and React Native applications from Figma design files and natural-language prompts, with "architectural guardrails and a 2-pass deterministic code generation engine designed for team-scale, long-lived application development." Plaintiff relies on this post-notice announcement as evidence that WaveMaker continued to promote and expand the accused functionality. Plaintiff does not allege the terms of any executed agreement, and does not allege direct infringement by Accenture. (*See* https://www.wavemaker.com/newscenter/accenture-and-wavemaker-announce-strategic-intent-to-help-growth-focused-organizations-scale-with-agentic-ai-platform/ (last visited August 23, 2026); https://newsroom.accenture.com/news/2026/accenture-and-wavemaker-announce-strategic-intent-to-help-growth-focused-organizations-scale-with-agentic-ai-platform (last visited August 23, 2026)).

61. Defendant makes, uses, sells, offers to sell, tests, designs, and distributes its low-code, AI-augmented application development platform and related tools, services, and technologies. More specifically, Defendant makes, uses, sells, offers to sell, tests, designs, and distributes its infringing products and services—including without limitation the WaveMaker Low-Code Platform, WaveMaker Studio, WaveMaker Web Studio, WaveMaker React Native Studio, the WaveMaker AI Platform (wavemaker.ai) (including its Agentic AI capabilities), the WaveMaker Rapid Application Platform (RAP), WaveMaker Rapid, the Two-Pass Coding System

(including WML), AutoCode, CoPilot, SDLC Agents (including Design-to-Code, API Integration, and Security Config agents), AIRA (Agentic Development Framework), Agentic App Generation Platform, Hybrid Studio, the Productivity Workbench, WaveMaker Enterprise (WME) and WaveMaker Enterprise Edition, WaveMaker AppChef, API/Database Auto-Generation Services, the WaveMaker API Designer, DevX, UX Design, Cloud Platform, Security, WaveMaker Prefabs, the Prefab Library and Prefab Component System/Repository, the WaveMaker Widgets Library, the WaveMaker Custom Widget SDK, the WaveMaker UI Kit, WaveXD, WaveMaker Templates and Themes, Theme Builder, MyStudio, Style Workspace (Design Token Management), Mockingbird (API Mocking Tool), the WaveMaker Marketplace, WaveMaker Mobile Apps, the WaveMaker Mobile App Builder, WaveMaker White Label/Custom Studio, Expert/Professional Services, and all enterprise modernization, white-label, and ISV solutions built upon or incorporating the foregoing (herein referred to as the "Accused Products" or "Accused Instrumentalities"). The Accused Instrumentalities specifically include all products and services (including but not limited to software, hardware, and network architectural design) manufactured, used, tested, sold, or offered for sale by or on behalf of Defendant practicing the '423 Patent and all processes employed by Defendant that infringe the '423 Patent, including without limitation the foregoing.

62. WaveMaker actively markets, sells, and distributes the Accused Products throughout the United States, including in the Eastern District of Texas, through its websites, direct enterprise sales, and channel partnerships, deriving substantial revenue from customers who use the platform to build and deploy applications that are used by millions of consumers and business users worldwide.

63. Since the reinstatement of the '423 Patent in June 2026, Defendant has continued to make, use, sell, offer to sell, and distribute the Accused Products, and to induce and contribute to their use by its customers, without license or authority from Native Pixel.

64. Defendant has knowingly (since at least the date of this Complaint) and willfully infringed the '423 Patent, and has intentionally and actively aided, abetted, and induced others to directly infringe the '423 Patent (such as its customers in this District and throughout the United States).

## JURISDICTION AND VENUE

65. This action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including 35 U.S.C. §§ 271, 281, 283, 284, and 285. This Court has original subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

66. This Court has personal jurisdiction over Defendant in this action because Defendant has committed acts within this District giving rise to this action, and has established minimum contacts with this forum such that the exercise of jurisdiction over Defendant would not offend traditional notions of fair play and substantial justice. Defendant, directly and through subsidiaries or intermediaries, has committed and continues to commit acts of infringement in this District by, among other things, making, using, offering to sell, and selling products that infringe the '423 Patent, and inducing others to infringe the '423 Patent in this District. Defendant regularly conducts and solicits business in, engages in other persistent courses of conduct in, and derives substantial revenue from goods and services provided to the residents of this District and the State of Texas.

67. Defendant is subject to jurisdiction pursuant to due process and the Texas Long Arm Statute, Tex. Civ. Prac. & Rem. Code § 17.041 *et seq.*, due to its substantial business in this

State and District including at least its infringing activities, regularly doing or soliciting business at its Texas headquarters, and engaging in persistent conduct and deriving substantial revenues from goods and services provided to residents in the State of Texas including the Eastern District of Texas.

68. WaveMaker, directly and/or through subsidiaries or intermediaries, has purposefully and voluntarily placed one or more infringing products and/or services in the stream of commerce with the intention and expectation that they will be purchased and used by consumers and enterprises in the Eastern District of Texas. WaveMaker's low-code application development platform and the other Accused Products have been and continue to be offered, sold, and used in the Eastern District of Texas.

69. Venue is proper in this District under 28 U.S.C. § 1400(b) because Defendant WaveMaker, Inc. maintains a regular and established place of business in this District, including at its principal United States headquarters located at 4965 Preston Park Blvd, Suite 825, Plano, Texas 75093, and has committed acts of infringement in this District. WaveMaker is registered with the Texas Secretary of State as a foreign for-profit corporation authorized to transact business in Texas (Texas Secretary of State file number 0804046072). Additionally, on information and belief, Defendant has transacted business in this District and has committed acts of direct and indirect infringement in this District by, among other things, making, using, offering to sell, and selling products and services that infringe the '423 Patent.

70. On information and belief, WaveMaker employs personnel in this District at its Plano headquarters in positions directly related to the development, sale, and support of the Accused Products, including sales, account management, customer success, and business development roles, and publicly advertises employment positions based at its Plano, Texas

headquarters, including on its careers page at https://www.wavemaker.com/careers/ (last visited August 23, 2026), which, as of that date, listed multiple open positions identified as being based at WaveMaker's Plano, Texas headquarters. WaveMaker's maintenance of a staffed headquarters facility, from which it conducts substantial business operations including the development, marketing, sale, and support of the Accused Products, constitutes a regular and established place of business within the meaning of 28 U.S.C. § 1400(b).

71. This action involves subject matter that comprises a material part of the operative facts of the -205 Action, in which Native Pixel asserts patents from the same family against the same Defendant. Native Pixel will identify the -205 Action as a collateral proceeding on its civil cover sheet in accordance with Local Rule CV-42(a), and assignment of this action to the same presiding judge as the -205 Action would serve the interests of judicial economy and consistency.

72. With respect to acts of infringement, WaveMaker commits acts of patent infringement within the Eastern District of Texas by making, using, offering, selling, and providing its infringing products and services, including without limitation the Accused Products identified above. Residents and businesses in the Eastern District of Texas access and utilize these infringing services, and WaveMaker derives revenue from such use. All allegations and support thereof regarding jurisdiction herein are hereby incorporated by reference for the purposes of venue.

## COUNT I
## PATENT INFRINGEMENT OF THE '423 PATENT

73. Plaintiff restates and realleges the preceding paragraphs of this Complaint, which are incorporated by reference as if fully restated herein.

74. Defendant, under 35 U.S.C. § 271(a), directly, literally, and/or under the doctrine of equivalents, has infringed and continues to infringe one or more claims of the '423 Patent by

making, using, testing, selling, and/or offering for sale in the United States Defendant's Accused Products.

75. To the extent any step of any claimed method is performed by WaveMaker's customers or their end users, WaveMaker directs and controls that performance and/or the performance is attributable to WaveMaker as part of a joint enterprise, because, among other things, WaveMaker operates the hosted platform infrastructure on which the accused functionality runs, conditions its customers' use of the platform and receipt of its benefits on use of WaveMaker's prescribed build, deployment, and runtime processes, and establishes the manner and timing of that performance through the platform's design and WaveMaker's prescribed instructions and documentation.

76. Defendant also indirectly infringes the '423 Patent by actively inducing the direct infringement by third parties under 35 U.S.C. § 271(b), at least as of the date of this Complaint. Defendant instructs and encourages its customers to use the Accused Products in an infringing manner, including through its documentation, tutorials, and marketing materials, which, among other things, instruct customers to build applications in WaveMaker Studio, to bind user interface components to data and APIs, to package and deploy applications (including instructions to package applications as WAR files or Docker containers and to build installable APK and IPA packages for app-store listing), and to use WaveMaker's runtime, prefab, and marketplace capabilities.

77. Defendant's documentation instructs customers through a complete workflow: (1) select and process Figma pages through AutoCode; (2) generate WaveMaker-compatible code; (3) open and refine the generated project in Studio; (4) bind APIs and implement business logic; (5) invoke target-code generation; (6) export the React Native project; and (7) build an APK or IPA

for execution on a target device. On information and belief, customers following those instructions directly use the complete accused workflow, and Defendant intends that instructed use. (*See* https://docs.wavemaker.com/learn/figma-autocode-plugin/working-with-autocode-plugin/ (last visited August 23, 2026); https://docs.wavemaker.com/learn/react-native/react-native-overview/ (last visited August 23, 2026); https://docs.wavemaker.com/learn/react-native/mobile-build-manual (last visited August 23, 2026)).

78. Defendant knowingly (since at least the date of this Complaint), intentionally, and actively aided, abetted, and induced others to directly infringe at least one claim of the '423 Patent (such as its customers in this District and throughout the United States).

79. Defendant contributorily infringes because, with knowledge of the '423 Patent (since at least the date of this Complaint), Defendant supplied a material part of a claimed combination, where the material part is not a staple article of commerce and is incapable of substantial non-infringing use. Among other things, WaveMaker supplies its runtime engine, code generators, and platform components that exist to implement the accused metadata-driven, runtime-bound UI architecture.

80. Defendant contributed to its customers' infringement because, with knowledge of the '423 Patent (since at least the date of this Complaint), Defendant supplied the technology that allowed its customers to infringe the '423 Patent.

81. Defendant has had knowledge (since at least the date of this Complaint) that its activities concerning the Accused Products infringed one or more claims of the '423 Patent. In addition, on information and belief, Defendant has been aware of Native Pixel's patent family since no later than March 16, 2026, when Native Pixel filed the -205 Action asserting patents from the

same family, and has been aware of the '423 Patent itself since no later than its review of the prosecution histories produced and cited in the -205 Action, in which the '423 Patent appears.

82. Defendant's customers, such as consumers or end users, actually infringe claims of the '423 Patent by using the Accused Products in the manner prescribed by Defendant, and as such, Defendant's customers are direct infringers.

83. Further, Defendant provides information and technical support to its customers, including promotional materials, product manuals, brochures, videos, demonstrations, and website materials encouraging its customers to purchase and instructing them to use Defendant's Accused Products (which are acts of direct infringement of the '423 Patent).

84. Alternatively, Defendant knows and/or will know that there is a high probability that the distribution, sale, offer for sale, and use of the Accused Products constitutes direct infringement of the '423 Patent but took deliberate actions to avoid learning of these facts.

85. On information and belief, Defendant's Accused Products were and are available to businesses and individuals throughout the United States and in the State of Texas, including in this District.

86. Defendant caused Native Pixel irreparable injury and damage by infringing one or more claims of the '423 Patent.

87. Native Pixel is entitled to recover from Defendant, and seeks, damages adequate to compensate for Defendant's infringement pursuant to 35 U.S.C. § 284, and in no event less than a reasonable royalty for the use made of the invention by Defendant.

88. Defendant's infringement of the '423 Patent is willful and merits increased damages under 35 U.S.C. § 284 and *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, 579 U.S. 93 (2016). First, on information and belief, Defendant has been aware of Native Pixel's patent family since at

least March 16, 2026, when the -205 Action was filed, and has been aware of the '423 Patent itself since no later than its review of the prosecution histories produced and cited in that action, in which the '423 Patent appears; Defendant has continued its infringing conduct without modification despite that awareness. Second, Defendant has had specific knowledge of the '423 Patent, of its reinstatement, and of the particular infringement allegations set forth herein since no later than service of this Complaint, and its continued making, using, selling, offering to sell, and support of the Accused Products after that notice is willful.

89. The representative claim chart attached hereto as Exhibit B describes how the elements of exemplary claim 12 of the '423 Patent are infringed by one or more of the Accused Products, charted against representative Accused Product WaveMaker Studio. While this chart specifically addresses the functionality of one product, the chart is illustrative rather than exhaustive and is representative of, and applies to, all Accused Instrumentalities because all the Accused Instrumentalities infringe in the same general way. This provides details regarding only one example of Defendant's infringement, and only as to a single patent claim for purposes of infringement notice; it is not an allegation or admission that claim 12 is representative of any other claim of the '423 Patent for purposes of any validity or eligibility analysis, including under 35 U.S.C. § 101. Plaintiff reserves its right to provide greater detail and scope via its Infringement Contentions at the time required under this Court's scheduling order.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Native Pixel Inc. respectfully requests the following relief:

A. A judgment that Defendant has directly infringed literally and/or under the doctrine of equivalents and continues to directly infringe the '423 Patent;

B. A judgment that Defendant has, since at least the date of this Complaint, actively induced infringement and continues to induce infringement of the '423 Patent;

C. A judgment that Defendant has, since at least the date of this Complaint, contributorily infringed and continues to contributorily infringe the '423 Patent;

D. A judgment and order requiring Defendant to pay Plaintiff damages under 35 U.S.C. § 284 for the periods during which the '423 Patent was in force, including without limitation both convoyed and derivative sales, as well as supplemental damages for any continuing post-verdict infringement through entry of the final judgment with an accounting as needed;

E. A judgment that Defendant's infringement since at least the date of this Complaint of the '423 Patent is willful;

F. A judgment that Defendant's infringement warrants enhanced damages pursuant to 35 U.S.C. § 284 and application of such damages;

G. A judgment that this is an exceptional case within the meaning of 35 U.S.C. § 285 and Plaintiff is therefore entitled to reasonable attorneys' fees;

H. A judgment granting a preliminary and permanent injunction preventing WaveMaker and its officers, directors, agents, servants, employees, attorneys, licensees, divisions, parents, subsidiaries, successors, assigns, and all those in privity, concert, or participation with any of them, from directly or indirectly engaging in infringing activities with respect to the '423 Patent;

I. An accounting for acts of infringement and supplemental damages for infringement and/or damages not presented at trial, including, without limitation, pre-judgment and post-judgment interest on the damages awarded;

J. A judgment and order awarding an ongoing royalty;

K. A judgment and order awarding Plaintiff costs associated with bringing this action;

L. All equitable relief the Court deems just and proper; and

M. Such other relief which may be requested and to which the Plaintiff is entitled.

## JURY TRIAL DEMANDED

Pursuant to FED. R. CIV. P. 38, Plaintiff Native Pixel Inc. hereby demands a trial by jury on all issues so triable.

Date: August 28, 2026

Respectfully Submitted,

/s/ Erick S. Robinson

Erick S. Robinson (Lead Counsel)
Texas Bar No. 24039142
Gregory Love
Texas Bar No. 24013060
CHERRY JOHNSON SIEGMUND JAMES PC
104 E Houston Street, Suite 115
Marshall, Texas 75670
Tel: (713) 498-6047
Fax: (713) 583-9737
erobinson@cjsjlaw.com
glove@cjsjlaw.com

Mark D. Siegmund
Texas Bar No. 24117055
"Grace" Shuya Yang
Texas Bar No. 24144144
CHERRY JOHNSON SIEGMUND JAMES PC
Bridgeview Center
7901 Fish Pond Road, 2nd Floor
Waco, Texas 76710
Tel: (254) 732-2242
Fax: (866) 627-3509
msiegmund@cjsjlaw.com
gyang@cjsjlaw.com

Shaun Gregory (admitted in this District)
Virginia Bar No. 86349
CHERRY JOHNSON SIEGMUND JAMES PC
One Glen Lakes Tower
8140 Walnut Hill Lane, Suite 105
Dallas, Texas 75231
Tel: (972) 987-0709
Fax: (866) 627-3509

Attorneys for Plaintiff
**NATIVE PIXEL INC.**